**Russell HARRISON, d/b/a Indiana Coldweld Company, et al., Plaintiffs-Appellees,**

v.

**INDIANA AUTO SHREDDERS COMPANY, a division of Pielet Bros. Iron and Metal, Inc., an Illinois Corporation, Defendant-Appellant.**

No. 75–1367.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1975.

Decided Dec. 31, 1975.

As Amended Jan. 8, 1976.

---

Stephen W. Terry, Jr., Indianapolis, Ind., for defendant-appellant.

Benjamin F. Hatfield, Jr., William A. Hasbrook, Indianapolis, Ind., for plaintiffs-appellees.

Before CLARK, Associate Justice,* FAIRCHILD, Chief Judge, and PELL, Circuit Judge.

* The Honorable Tom C. Clark, Associate Justice of the Supreme Court of the United States (Retired), is sitting by designation.

**CLARK, Associate Justice.**

This is an appeal from a judgment of the United States District Court for the Southern District of Indiana in a nuisance action,[1] permanently enjoining appellant-Indiana Auto Shredders Company from operating its shredding plant for the recycling of automobiles in the Irish Hill section of Indianapolis, Indiana, and awarding $176,956 in compensatory and $353,912 in punitive damages to plaintiffs and intervenors. The suit was filed by appellee-Russell Harrison (d/b/a Indiana Coldweld Company) and some 33 other "claimants" who reside or work in the Irish Hill section, alleging: (1) that the dust, vibration, and noise generated by the company's shredding plant constituted a common law and statutory nuisance under Indiana law[2] by damaging property and endangering the health and safety of residents and workers in the area; and (2) that the company's shredding plant violated various local air pollution regulations.[3]

This case presents the very difficult question of how to balance the legitimate demands of an urban neighborhood for clean air and a comfortable environment against the utility and economic enterprise of a beneficial, but polluting, industry. The trial court devoted over thirty trial days to the case on the preliminary[4] and final hearing and concluded that the company must cease opera-

---

1. The suit had originally been brought in the Marion Circuit Court, Marion County, Indiana, but was removed to the United States District Court for the Southern District of Indiana on the basis of diversity of citizenship since appellant is a division of an Illinois corporation.

2. Burns Indiana Statutes Annotated §§ 2–505 through 2–507 (IC 1971 34–1–52–1, 2 and 3) are as follows:

 "[2–505] Nuisance—Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action.

 "[2–506] Nuisance—Who May Sue—Such action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance.

 "[2–507] Nuisance—Remedy—Where proper case is made, the nuisance may be enjoined or abated, and damages recovered therefor."

 In *Davoust v. Mitchell,* 146 Ind.App. 536, 257 N.E.2d 332 (1970), the court held that the statute is merely a codification of common law. For an example of a recent court interpretation of Indiana's law of nuisance, see the opinion in *Cox v. Schlachter,* 147 Ind.App. 530, 262 N.E.2d 550 (1970).

3. The Air Pollution Control Ordinance of the City of Indianapolis, General Ordinance No. 109 (1967, as amended, June 28, 1973) in pertinent part, states:

 "Section 1.3 Definition of Terms
 "1. Air Contaminant.
 Particulate matter, dust, fumes, gas, mist, odors, smoke, soot or vapor, or any combination thereof, also radioactive substances.

 "2. Air Pollution.
 Presence in the outdoor atmosphere or ambient air of one or more air contaminants, in sufficient quantities and of sufficient characteristics and duration as to be injurious to human, plant or animal life or to property, or which unreasonably interfere with the comfortable enjoyment of life and property."
 The pertinent portion of Indianapolis Air Pollution Control Board, Regulation II, Particulate Emission (amended June 28, 1973) provides:

 "It shall be unlawful for any person owning or in charge of any fuel-burning, refuse-burning, combustion or process equipment or device, or open fire, to cause, suffer or allow the emission of particulate matter into the atmosphere except in conformity with the limits set forth as follows:

 * * * * * *

 "II—4 Air Borne Particulate
 * * * * * *

 "C. It shall be unlawful for any person to permit or cause the emission of such quantities of air contaminants from whatever source in such place or manner as to be detrimental to any person or to the public or to endanger the health, comfort, or safety of any person or the public or in such manner as to cause injury or damage to property or business."

4. The preliminary hearing commenced on October 24, 1974, and resulted in the issuance of a temporary injunction closing the shredder, but the injunction was made subject to the filing of a substantial bond by claimants. Bond was originally set by the district court at $50,000, but was subsequently reduced to $25,-000. No bond was filed and no writ issued.

tion of the shredder and pay damages, both compensatory and punitive, for the nuisance it caused to the Irish Hill neighborhood. On March 25, 1975, upon the filing of a 114-page memorandum of decision granting such relief to the claimants, the court allowed appellant an additional 40 days to close down operations of the shredder. An appeal was promptly filed, and a temporary stay was entered by this court on April 29, 1975. That order was vacated on May 8, 1975, and the shredder was shut down in accordance with the district court's judgment, remaining so to this day. For reasons stated below, we reverse the judgment of the district court.

## I. HISTORICAL BACKGROUND

In recent years, the abandoned and junked automobile has become recognized as one of this country's major solid waste disposal problems.[5] Auto "graveyards" represent not only an aesthetic blight that mars the natural beauty of the land, but also a scandalous waste of energy and resources that produced those cars. The concept of salvaging discarded automobiles and other metals by shredding them and recovering the ferrous metal was developed by a Texas inventor and industrialist, Sam Proler, in the early 1960's. Typically, a shredding machine is composed of massive rotary teeth (called "hammers") that rip off pieces of the automobile as it passes a cutting edge and then spits fist-sized chunks of metal and other matter across a series of "cascades," blowers, and magnets, which separate the ferrous metals from the non-ferrous metals and debris. A series of conveyors then carries the product and waste to storage. A "hammermill" such as the one in this case weighs 220 tons and measures approximately ten feet in width, fourteen feet in length, and nine feet in height. The conveyors, blowers, cascades, motors, and storage bins that clean, treat, and house the shredded product are built around this central machine. There are several manufacturers of such machines, and hundreds are presently in operation throughout the country, including four in Detroit, and one each in Chicago, St. Louis, Louisville and Columbus.[6]

In 1970, Proler, in combination with several local partners, decided to construct and operate a shredder in the Indianapolis area and for that purpose acquired the location now in dispute—a 20-acre tract formerly used as a roundhouse by the Penn Central Railroad. This site seemed particularly attractive for the proposed heavy operation, since an interstate highway was only eight blocks away and the original roundhouse tracks were still connected to the railroad main lines. Moreover, the roundhouse and other railroad facilities formerly on the site had long since been removed, and for the past 20 years, in fact, the site had served as little more than a community dumping ground.

At the time of purchase, the site was zoned for industrial use, I–4–U,[7] and Proler filed an application with the local planning agency for rezoning under the heaviest industrial classification, I–5–U.[8]

5. *See* Reichert, "Recycling Automobiles: Do Present Laws Act as Bottlenecks?" 2 Env.Law 105 (Winter, 1971).

6. The particular machine that is the subject of this suit represents a $1,800,000 investment for the Pielet Brothers, and resulted in gross profits of over $2,000,000 during the period of July 16 to November 30, 1974.

7. Permitted uses under the I–4–U classification, according to the Industrial Zoning Ordinance of Marion County, Indiana, Section 2.08, include: bulk storage of petroleum products, saw mills, foundries, railroad equipment manufacturing, repair and servicing, steel fabricating, soap manufacturing, truck terminals, etc.

8. Permitted uses under the I–5–U classification, according to the Industrial Zoning Ordinance of Marion County, Indiana, Section 2.08a, include: scrap metal, junk or salvage storage, open or enclosed, including auto wrecking or similar uses; lumber yards; concrete and cinder block manufacture; similar uses requiring outside storage. The I–5–U classification is the heaviest industrial classification that the zoning ordinances provide for. The ordinance sets strict standards regarding noise, air emissions, landscaping, vibrations, etc., for each classification. Those standards for the I–5–U classification are set forth in the text at page 1112, *infra*.

While this application was pending, Proler encountered some opposition to the project from those in the older residential areas scattered throughout the industrial plants of Irish Hill. In an effort to forestall such antipathy, he unilaterally imposed upon the tract a set of restrictive covenants, of which more will be said below. In December of 1970, despite these early self-imposed restrictions, the City-County Council of Marion County rejected the recommendation of the planning agency and voted to disapprove the rezoning.[9]

Proler subsequently reapplied for the I–5–U classification, eliminating seven acres from the tract and re-emphasizing his intention to observe all appropriate use, development, and performance standards. In his second application papers, Proler stated that he wished to build "a metal manufacturing plant capable of converting automobiles . . . into their basic metal components." He further promised:

"that the plant itself will be self-contained, although outdoor storage of raw materials [i. e., automobiles, etc.] and of metal products will be necessary; that all development standards appropriate for the requested classification will be observed; that the Proler Corporation offers to landscape the south line abutting the area used for its plant with landscaping . . . ; and that the Restrictive Covenants previously offered . . . are renewed."

The restrictive covenants attached to the reapplication provided as follows:

(1) No trucks over 50 feet in length shall use Bates and DeLoss Streets (two residential streets adjacent to the site) in going to or from the shredder site;

(2) A public pedestrian easement shall be dedicated ten feet wide within the bounds of vacated Leota Street and running from the Penn Central right of way on the north to the south end of the 20-acre tract;

(3) The metal processing plant will be installed as shown on a plan attached, although specific structures may be changed in site or removed somewhat in location;

(4) A buffer strip at least 20 feet in depth shall surround the metal processing plant and the outdoor storage areas for raw materials and finished material, in accordance with a design by the administrator of the Department of Planning and Zoning;

(5) A fence shall surround the entire metal processing areas, at least 20 feet inside the borders of the property and shall be of a non-see-through variety and shall be at least 8 feet tall;

(6) No burning shall occur, and no smoke or toxic gases shall be emitted from the metal processing operation in sufficient quantities to either violate the standards of the Air Pollution Control Ordinance of the City of Indianapolis or to be offensive to a person or normal sensibilities having proper regard for the conditions prevailing in the surrounding neighborhood;

(7) The noise generated by the shredder over any two-hour representative period when measured from a distance equal to the distance from the shredder itself and any point on Leota Street (but not vacated Leota Street), Shelby Street, State Street, or Bates Street shall not average in excess of

9. The Indianapolis-Marion County area has been organized into a metropolitan form of government. The procedure for rezoning real estate in Marion County is a six-step process. First, a petition setting forth the requested change is filed with the Metropolitan Development Commission. A hearing examiner is appointed to conduct a public hearing. Upon the record of the hearing, the examiner makes a recommendation to the full Commission. The Commission then holds a second hearing on the petition and votes its approval or rejection. The approved petition is sent to the City-County Council for Marion County. The City-County Council may either approve the petition or vote to hold still another hearing at which the proposed change can be rejected. If the City-County Council does not vote to hold a hearing, the petition is approved automatically.

the noise level beyond the range of 85 to 95 decibels, when measured from these points by applicable noise exposure regulations promulgated by the United States Department of Labor;

(8) No industrial waste . . . generated by the metal processing operation shall be permitted to accumulate on, or to be in any manner discharged beyond the limits of, the Proler tract, and all such refuse shall be hauled away from the same; and

(9) The restrictive covenants supplement and do not waive or restrict the standards established by the Industrial Zoning Ordinance.

Proler's reapplication was considered and approved by the local planning agency, and subsequently the rezoning to I–5–U was accomplished when the City-County Council failed to act to stop the change.

Under the I–5–U classification, property may be used for scrap metal operations such as a shredder provided that the following requirements are met:

(1) Fencing shall be provided that is at least 6 feet high and 20 feet from property lines, and a buffer planting strip shall be built at least 20 feet in depth between the property lines, enclosing the entire outside and operation area, including a compact hedge, row of shrubbery or evergreen trees extending the full length of the buffer strip and at least six feet high or such additional height to effectively screen from view at every point along the property lines all materials stored and outside operations, with any ground area between such shrubbery and the property lines in grass or suitable ground cover and/or shrubbery maintained in good condition and free of litter;

(2) The maximum height of buildings and structures shall not exceed 50 feet, except chimneys, smokestacks, flagpoles, or roof structures for the housing of such equipment as elevators or water tanks;

(3) The maximum vertical height of equipment and materials shall not exceed 20 feet and shall be effectively screened as aforesaid, and such equipment and storage shall be at all times limited to a height so screened, whether at the maximum or lower;

(4) The emission of smoke, particulate matter or noxious or toxic gases shall conform to the standards and regulations of the Air Pollution Control Ordinance of the City of Indianapolis, as amended;

(5) No use shall cause earth vibrations or concussions beyond the lot lines endangering the public health, safety or welfare or cause injury to property;

(6) No use shall emit odorous matter across the lot lines in such quantities as to endanger public health, safety or welfare or cause injury to property;

(7) No use shall emit sounds beyond the lot lines in such a manner or intensity as to endanger the public health, safety or welfare or cause injury to property;

(8) The storage, utilization or manufacture of all products or materials shall conform to the standards of the National Fire Protection Association and shall not produce a hazard, or endanger the public health, safety or welfare;

(9) No use shall accumulate or discharge beyond the property lines any waste matter in violation of the applicable standards and regulations of the Division of Public Health of the Health and Hospital Corporation of Marion County, Indiana, the Indiana State Board of Health, the Stream Pollution Control Board of the State of Indiana or in such manner as to endanger the public health, safety or welfare, or cause injury to property.

After securing the passage of the zoning ordinance in 1971, however, Proler became ill and abandoned his plans to build a shredder in Indianapolis. Nothing further occurred at the site, until early in 1974, when appellant rejuvenated the project.

Pielet Brothers Iron and Metal, Inc., of Illinois, had been operating an automobile shredder in Chicago since 1971 and had also installed a shredder in Canada in partnership with the Canadian government. When it decided to expand, Pielet Brothers conducted a site search and, much to its amazement, located Proler's twenty-acre tract. They found the site ideal, not only because of its rail and highway access, but also because it had already been zoned for precisely the sort of shredder operation envisioned by Pielet Brothers. Moreover, it had ample water supply to provide the one hundred gallons per minute required by the shredder, and also had the heavy industrial electricity necessary for the machine. In addition, since the shredder produced some 150 tons of waste per day, it was essential to have landfills in the vicinity, and the largest landfills in Indiana were nearby. Pielet Brothers organized the Indiana Auto Shredders Company as a division of the larger corporation in early 1974 and took steps to begin what they expected to be a successful shredder business in Indianapolis.

The company purchased the Proler site, filed the necessary applications for permits as recommended by local counsel, and began construction of the shredder and a small office building. Because of large expected start-up costs, especially in electricity to power the shredder, the company desired to stockpile cars before the start of operations, and therefore began acquiring cars to shred as early as May of 1974, only a few weeks after construction had begun. When the overflow of these early acquisitions spilled onto adjoining Shelby Street, the first complaints from Irish Hill residents reached the company. The cars were moved onto the shredder property, and the company's problems with its neighbors were solved, at least for the moment. With construction completed, the shredder went into operation on July 16, 1974.[10]

Earlier, on July 12, 1974, a zoning enforcement official notified the company by letter that it was storing and stacking cars above the permissible height line, in violation of § 2.08a(B)(8) of the Marion County Industrial Ordinance. On July 22, after operations began, the first of what would be numerous visits by television news teams took place, and WISH–TV televised a newsfilm of the shredder in operation during that evening's broadcast in Indianapolis. Apparently, the company responded to this publicity and to the zoning official's letter by reducing the height of the stacked auto hulks. At about the same time the company began looking for a better method of cleaning the pavement on its property around the shredder, since the rotary broom that the company was using to clean the plant grounds kicked up too much dust as it swept. Also, mud was tracked across the pavement when the autos were moved from the unpaved portions of the property to the shredder, which would dry and then be ground into dust by traffic around the shredder, and, if not cleaned up, would soon become airborne as particulate emission spreading over the neighborhood.

In early August, the first complaints from Irish Hill residents about the shredder's noise, vibration, and air pollution came to the attention of the company. At that time, a forty-one man crew, working in two shifts, operated the machine for twenty-three hours of each day. Later in the month, when more residents complained, the company reacted first by making basic improvements upon the shredder machinery, and second

---

10. The plant went into operation technically before the issuance of installation and operating permits by the Indianapolis Air Pollution Control Board, but the record clearly indicates appellant began operations with the knowledge and acquiescence of those authorities. The installation permit was formally issued on November 18, 1974, and on December 5, 1974, an operating certificate was issued. At the trial, the director of the air pollution agency testified that the delay in issuing the permits was not unusual and was due in part to a shortage of administrative and inspection personnel, and not necessarily due to any failure of appellant to follow proper procedures or to comply with operating standards.

by seeking further advice from experts. The company went ahead with its original plans to install a second cyclone and additional water sprayers with greater volume to keep down the dust and debris at the discharge end of the operation; it constructed a large hood over the shredder mouth to minimize dust at the intake end of the operation; and it used a sound-deadening foam to reduce the noise at the cascades where the newly shredded metal was jostled and sifted until it separated into its various components.

In early September, new problems arose. The zoning official, who had previously cited the company for its height violations, visited the site and noted a second violation of the I–5–U standards: the required buffer strip of shrubs and landscaping had not been built. Another television station brought more publicity to the subject by sending a broadcast crew to discuss with Irish Hill residents the problems caused by the shredder. Meanwhile, attempting to remedy earlier problems, the company installed covers over the conveyors to prevent the wind from picking up particulate debris and dispersing it into the ambient air around the site. It also obtained a replacement for the rotary broom: a new pavement sweeper that prevented "fugitive dust" from becoming airborne by wetting it down before sweeping it up. Further paving to reduce the tracking of the mud and the kicking up of dust by traffic was planned for the following spring.

Despite these initial efforts, a group of Irish Hill residents and businesses commenced this nuisance suit on September 10, 1974, seeking both damages and the permanent shutdown of the shredder in the Indiana courts. After defendant's removal of the case to the federal district court, five additional Irish Hill residents petitioned the court to intervene as plaintiffs. The petition was granted.

On October 21, 1974, the district court began three days of hearings upon the request for a preliminary injunction made by the combined plaintiffs and in-tervenors (claimants). On October 24, the court acted upon the claimants' eyewitness testimony about the shredder's defects and issued a temporary injunction subject to the filing of a bond by the claimants. No bond was filed, and the court set December 10 as the date for a full trial on claimants' damages and a permanent injunction. In the meantime, the company made still more improvements at the site. The sides of the storage bins for waste and non-ferrous materials were raised an additional twelve feet, and frames for roofs over the bins were constructed. Further, the stacks above the blowers were increased to forty feet to reduce ground turbulence from the blasts of air the blowers made in cleaning the shredded material. On November 21, the court permitted fourteen more residents to intervene in the case as plaintiffs.

Since first learning of the complaints, the company had been cooperating with zoning officials and the City Air Pollution Control Board about problems at the site. Both installation and operating permits were issued to the company by the Board before the start of the trial.[11] At the suggestion of the Board, the company hired a local air pollution expert to take stack tests of the shredder; on November 26, a Board official observed the testing. The expert concluded from the tests that the pollution from the stacks was well below the maximum particulate emission standard set by the Board and other air pollution agencies. The testing crew themselves, however, became very dirty from dust and debris swirling in the air near the cascades, and they recommended that hoods be installed over that part of the machine. The company complied, and a second visit by the expert and a Board official, only a few days before the trial, brought complete approval of the shredder operation by the Board.

## II. TRIAL EVIDENCE

The trial to the bench began on schedule on December 10, 1974. All of the

11. See note 10, *supra.*

evidence given at the hearing on the preliminary injunction was incorporated by reference into the trial. As had happened at the preliminary hearing, the claimants' evidence at trial was of a different nature from that of the company. Most of the witnesses for the claimants were themselves residents or employers in the Irish Hill section, and they described first-hand the vibration, noise, and air pollution they had experienced. They testified that these conditions damaged their property and seriously affected their ability to live and work comfortably in the area. In presenting its defense, on the other hand, the company did not attempt to rebut this subjective evidence, but instead focused its efforts to ameliorate the difficulties in "starting up" the shredder operation and upon its compliance with all of the applicable ordinances and regulations. In contrast to the "ordinary citizens" who testified for the claimants, most of the company's witnesses were experts and specialists in environmental, industrial, or real estate affairs.

In order to understand the evidentiary predicament [12] in which the parties placed the trier of fact by compelling him to compare "apples" and "oranges," as it were, it is important to view the evidence in the order in which it was presented to the trial judge.

Claimants began their case-in-chief with the type of testimony that dominated their entire presentation of evidence: eyewitness testimony by neutral, lay witnesses who had visited the area. Three newspersons from local television and radio stations testified to observing and feeling vibrations caused by the shredder in different homes in the Irish Hill section. This testimony, however, was based upon observations that the three had made in the late summer or early autumn, before the company had made many of its improvements. Much of the eyewitness testimony given in the trial would suffer from this same defect.

Nevertheless, the Irish Hill residents were able to give detailed testimony of the discomfort and damage that they believed the shredder had caused them since the beginning of its operations in July. Over thirty persons from the Irish Hill community took the witness stand to testify to cracks in their walls, sleepless nights, explosions that disturbed children and parents, and the collection of dust and debris on their property and equipment. In one instance, Russell Harrison, Sr., one of the original plaintiffs, testified that the shredder's vibrations prevented him from operating a wet-surface grinder that he had recently purchased.[13] Claimants Josephine Krauth and Juanita Snider gave similar testimony about the vibrations, and also complained of the noise that the shredder made early in the morning and the dust and debris they continually swept from their porches and washed from their walls. All the testimony given by the claimants differed more in degree and dimension than in substance; clearly, they considered the shredder a "nuisance." The buildings allegedly damaged by the shredder were all in excess of fifty years old, yet, the trial court allowed each of the claimants to give his own unprofessional opinion of how much the shredder had decreased the value of his home or business property.[14]

To bolster the testimony they had given, the claimants presented various dignitaries and prominent citizens of Indianapolis who had become involved in the

---

12. See text at note 16, *infra*.

13. On cross-examination, Harrison admitted that the machine had been purchased used for much less than its normal price and that there had been only one attempt to make it work. Later, during plaintiffs' rebuttal case, Harrison's son was unable to say that the machine had ever been tested again, even though other plaintiffs had reported that the company had been able to reduce the vibrations considerably and almost six months had elapsed since the last efforts to use the machine had been made.

14. This testimony was admitted over the company's objections; the court explained that the evidence would be given its proper weight and granted the company a standing objection to such non-expert testimony.

shredder dispute; radio and television publicity had apparently made the affair into something of a *cause celebre*. One by one, various members of the Indianapolis community testified for the claimants and corroborated their testimony about the noise, vibrations, and air pollution caused by the shredder. The Deputy Mayor of Indianapolis, the Corporation Counsel for the City of Indianapolis, a local school board member, the director of mayor's Office of Neighborhood Services, the medical community's representative to the Indianapolis Air Pollution Control Board, a local manufacturer's representative for heavy industrial equipment, and an aide to United States Senator Birch Bayh all testified to their personal observations of the shredder and the problems it caused to the Irish Hill section.

Although this testimony gave support to the claimants' characterization of the shredder as troublesome and annoying, none of it was competent to prove that the shredder constituted a threat or hazard to the health and life of the community. For example, Dr. Emmett Lamb, a trained surgeon specializing in industrial medicine and the medical profession's representative to the Air Pollution Control Board, gave testimony about his observations. Over defendant's objections, he gave his opinion that the shredder might have a deleterious effect on the surrounding neighborhood, even suggesting that the air pollution from the shredder might have carcinogenic properties.[15] But even though he could give credible testimony about the observations he had made of the shredder's vexations to the neighborhood, Dr. Lamb could give neither qualitative nor quantitative analysis of the emissions and was able to give only tentative opinions about possible health hazards caused by the shredder because he had never analyzed or measured the shredder's emissions. In fact, the claimants were unable to present any evidence of imminent health hazards caused by or attributed to the shredder.

To further bolster their case, the claimants did try to present some expert testimony about the shredder. They obtained testimony from the Administrator of the Code Enforcement Division of the Indianapolis Department of Metropolitan Development, James T. Crawford, about his observations of the shredder. But he was able to point to only two minor violations of the zoning ordinance by the company: the recurring height violation from stacking material in excess of the fence height and the failure to build an appropriate buffer strip of screening trees and landscaping. He admitted that the company was giving his department its full cooperation. A representative of the Air Pollution Control Division of the State Board of Health, Andrew Sunderland, also testified for the claimants. Although he had personally "eyeballed" particulate emission coming from the shredder, he admitted on cross-examination that his last observation of the shredder site had been made several weeks before the company made major improvements in its air pollution equipment, improvements which resulted in the granting of an operation permit by the local Air Pollution Control Board.

Early in the trial, there was testimony by a woman radio broadcaster about explosions at the shredder site. This matter of explosions was of some interest to the court, and additional witnesses were called to testify regarding it. Apparently, once in a while, the gas tank of an auto being processed would explode as it went through the hammermill of the shredder operation, because even a tiny amount of gasoline left in a tank may be highly volative. Claimants' witness, Richard Flaherty, a fire department official, described his investigations into complaints about these explosions and testified that one of the company's agents admitted that explosions occasionally would occur if the preliminary processors failed to remove the gas tank before delivering the auto to the compa-

**15.** On cross-examination, Dr. Lamb admitted that he believed the enforcement staff of the Air Pollution Control Board to be competent and that the Board had never taken any action against the company.

ny. On cross-examination, he admitted that the explosions presented little danger to the neighborhood and that the company gave the fire department its complete cooperation on the matter.

The claimants' opinions about the decreased value and alleged damage to their homes and businesses was at least partially substantiated when two sets of local experts testified. A local real estate appraiser and a real estate salesman gave their estimates of the valuation of claimants' homes before and after the shredder started operations. These estimates were considerably less than the claimants had given. Additionally, two members of a local building supplies firm gave their estimates of the cost of repairing the damage which claimants believed the shredder caused to their fifty-year old buildings. In some cases, these estimates of repair ran much more than the home was ever worth.

In the end, claimants had consumed nearly three weeks of trial with sincere but unsophisticated assessments of the harm the shredder had caused. Taken altogether, claimants' evidence gave strong proof of the displeasure and annoyance caused by the shredder's noise, vibration and air pollution. Nevertheless, because that evidence was based on subjective testimony, it failed to show either actual health hazards or significant damage to building structures that could be proved to be directly caused by the shredder, i. e., no visible damage occurred while vibrations from the shredder were felt in a building.

The Indiana Auto Shredders Company presented a defense that contrasted sharply with the claimants' case, both in form and in substance. While admitting difficulties in "starting up" operation of the shredder, the company stressed that much had already been done, and more would be done, to make the shredder in Irish Hill the cleanest and quietest shredder possible. The company's witnesses were primarily experts who testified about testing done at the site. An expert on the combustion of volatiles (explosions), Dr. Abraham Max, testified about the safety features of the hammermill and the precautions taken to prevent dangerous explosions. He gave his opinion that the possibility of danger or damage to the surrounding property was negligible at best. Maurice Kelsey, an air pollution expert hired by the company at the suggestion of city officials, testified concerning the results of stack tests he performed at the shredder site. The tests, observed by city officials, showed that the company was operating the shredder well within the standards for particulate emission promulgated by the Indianapolis Air Pollution Control Board. Noise and vibration experts, John F. Wiss and Lyle Yerges, confirmed the testimony given at the preliminary hearing: although perceptible and perhaps even annoying, especially during sleeping hours, the shredder's noise and vibrations were well within the local standards.

On the question of damages to buildings and homes, the company presented real estate expert John Jameson, the only one of the real estate witnesses at trial who held the MAI (Member of Appraisal Institute) designation of the American Institute of Real Estate Appraisers. Together with a local real estate salesman, he made detailed investigations of each of the allegedly damaged buildings. This was in sharp contrast to claimants' expert, who made some of his estimates from the sidewalk and admitted that he was merely speculating when he calculated depreciation to the properties as a result of the notoriety of the lawsuit brought by the claimants. Mr. Jameson gave his opinion that the shredder had not reduced the valuation in claimants' properties by any significant amount because the properties were already antiquated and because the area had become very industrial.

On the question of particulate emissions, one of the most important of defendant's witnesses was Mr. Lewis F. Scott, Chief Environmental Control Engineer for the Indianapolis Department of Public Works. In that position, Mr. Scott was the chief of staff for the in-

vestigations and recommendations made to the Indianapolis Air Pollution Control Board by the department and was the head of the office that issued the company's operation permit under the air pollution regulations. He gave extensive testimony on the methods and procedures of his enforcement staff and the basis upon which Indiana Auto Shredders Company was issued an operation permit. He stated that issuance of the permit to the company was certification of his agency's conclusion that the company was in compliance with the Air Pollution Control Ordinance of the City of Indianapolis, General Ordinance No. 109 (1967, as amended, June 28, 1973). He verified that no change in air quality at the site had occurred since the December 5, 1974 issuance of that permit, and stated that there was nothing that required him to alter his conclusion about the company's compliance.

Additionally, the company presented testimony by Seymour Pielet, the president of Pielet Brothers, and Clare Lees, the company's on-site manager, about the efforts that the company was making to improve the shredder. On the matter of the explosions, Lees explained what had been done to prevent the recurrence of explosions: the company posted signs and warnings of penalties, to both processors and employees, for failure to remove gas tanks and effected an additional inspection procedure of the cars before shredding.

It is important to note that, even as the trial was going on, the company was making further attempts at rectifying any discomfort the shredder might cause the neighborhood. For example, on December 24, 1974, the company constructed a deep trench along its boundary with adjoining property owners in an attempt to reduce the vibrations crossing its property lines. On December 28, while

the trial was in progress, one of the plaintiffs, Mr. Robert Snider, Sr., and several other claimants contacted their attorney to say that the trench gave them much relief from the vibrations they had been suffering. Thereafter, John Wiss, the company's vibration expert, testified that his tests showed that the trench had reduced vibrations by over fifty percent.

The trial that began December 10, 1974 ended on January 15, 1975. That date brought to conclusion a record of over three thousand pages and the testimony of better than sixty witnesses concerning 250 exhibits.[16] At the end of this exhaustive presentation and just prior to the closing arguments of counsel, the trial judge well stated the dilemma that faced him:

"So, here the court has before it evidence on the one hand indicating that the defendant's operation is within the city ordinance limitations. On the other hand, we have the plaintiffs and intervenors testifying as they have in regard to their observances and in regard to the damage suffered by reason of the vibration.

"The court has told counsel in the court's chambers that if it had to make its ruling again concerning the evidence and the testimony it had heard in support of the petition for a preliminary injunction that it would rule exactly as it ruled previously. I don't think the court would have had any other alternative to follow. The evidence was there, it was abundantly clear that the neighbors, both the business neighbors and the residential neighbors, were suffering from air pollution and vibration and from noise. Now, the record indicates a great deal of change has been worked since the date of the conclusion of the hearing

---

16. The claimants called sixteen witnesses at the preliminary hearing and forty-nine at the trial, entering envelopes of debris and dust, pictures, slides, and movie film as exhibits. Defendant called seven witnesses at the pre-

liminary hearing and nine at the trial. Its exhibits included the operation and installation permits for the shredder and all the reports and test results collected by the experts.

on the petition for preliminary injunction."

This comment was, in part, a response to the company's motion for court appointment of an independent expert to study the air pollution problems of the shredder and make a report of his recommendations to the court. The court noted that it had earlier suggested that:

"[T]he only way perhaps the court could put its mind completely to rest would be to have the benefit of either a panel of neutral experts, or a neutral expert in regard to particulate emissions."

Nevertheless, the court indicated that it had not made up its mind about what to do. Some relief to the claimants was certainly called for by the evidence; the question facing the court was how to shape that relief.

In discussing his options in resolving the problem, the trial judge limited himself to only two alternatives:

"I have told counsel, and I would say this for the benefit of the parties in the courtroom here, there is only a few ways the court could go in resolving this lawsuit. Number one, the court can allow the business to carry on and award permanent damages to the persons who are injured. . . .
The other alternative to the first, that is, the continuation of the business and the payment of damages, I should call this the second alternative, is an outright injunction or, to be more accurate, a halting of the operations by an injunctive order, ordering the business to cease operation and be moved. Well, you can imagine, in the face of the evidence the court has heard, the effect of this decision from the standpoint of the defendant. The amount of money that has been invested and the relative harm that is caused the defendant as related to the plaintiffs when measured by dollars. There is

no question about that, the amount of money damages would be far, far greater in view of this record that the defendant would suffer than what the plaintiffs would suffer in the way of money damages, and I would say that would be true if you were to aggregate money damages that the plaintiffs have established in the record. I merely point out this second alternative is a very serious decision to make."

■ The next day, January 16, the court announced its decision. First, it decided not to appoint a neutral expert, apparently because the claimants would not agree to it. Although the claimants seemed to agree that such an appointment was desirable when first discussed, they withdrew their approval of such an idea, indicating that they believed it would add nothing to the evidence already presented. Second, the court decided to choose, not one or the other of the alternatives it said it would consider, but both of them. The court said that it would issue a permanent injunction ordering the shredder to cease operations *and* award permanent and punitive damages to the claimants for the deceased valuation in their properties. Although the court conceded the "very real social function" that the shredder performed in disposing and recycling old automobiles, it concluded simply that the machine ought to be somewhere else.[17] Additionally, the court announced that the company would be given forty days within which to close down operation of the shredder and that the time would not commence until the formal judgment and memorandum of decision were issued.

On March 25, 1975, the court entered its judgment on behalf of the claimants. At the same time, it filed a 114-page memorandum of decision in which it made its detailed findings of fact and conclusions of law.[18] The result could

---

17. The trial court remarked that if there was "another place in Marion County" to put the shredder, "I would burst out in smiles." Clearly, however, the policy determination in locating the appropriate site for this or any

other heavy industry lies with the zoning authorities and not with the courts.

18. In its conclusions of law, the court determined: (1) jurisdiction was proper; (2) the

not have been more harsh for the company: it was compelled both to permanently cease operation of the shredder and to pay a half million dollars in compensatory and punitive damages. In order to comply with the court's order, it had to lay-off forty employees and it will have to expend an additional million dollars to move the shredder to some other location. Thus, in its appeal to this court, the company challenges not only the trial court's findings of fact, but also the appropriateness of its injunctive decree and the standard upon which it fixed permanent and punitive damages.

## III. DISCUSSION

█ We do not quarrel with the trial court's determination that the shredder's effect upon the quality of life in the Irish Hill community entitled the claimants to some form of equitable relief and damages. Our review of trial court's findings under Rule 52, Fed.Rules Civil Proc. and its award of damages is ordinarily limited to only what is "clearly erroneous." Upon critical examination of the record, the findings of fact, and the conclusions of law, however, we encounter mixed questions of law and fact, findings in part that are clearly erroneous, and applications of the wrong legal standards. In such a situation, the trial court's determinations are more freely reviewable and vulnerable to attack than they normally would be under operation of the "clearly erroneous" test of Rule 52. *See Chandler v. United States*, 226 F.2d 403, 405 (7th Cir. 1955) and Wright & Miller, Federal Practice and Proce-

dure: Civil § 2589. Accordingly, because the award of *both* permanent injunctive relief *and* permanent and punitive damages was improper, we reverse the judgment below, and give directions for the resolution of this difficult case upon remand.

This case is representative of the new breed of lawsuit spawned by the growing concern for cleaner air and water. The birth and burgeoning growth of environmental litigation have forced the courts into difficult situations where modern hybrids of the traditional concepts of nuisance law and equity must be fashioned. Nuisance has always been a difficult area for the courts; the conflict of precedents and the confusing theoretical foundations of nuisance,[19] led Prosser to tag the area a "legal garbage can." [20] In any case, environmental consciousness may be the saving prescript for our age. Thus the right of environmentally-aggrieved parties to obtain redress in the courts serves as a necessary and valuable supplement to legislative efforts to restore the natural ecology of our cities and countryside.

Judicial involvement in solving environmental problems does, however, bring its own hazards. Balancing the interests of a modern urban community like Indianapolis may be very difficult. Weighing the desire for economic and industrial strength against the need for clean and livable surroundings is not easily done, especially because of the gradations in quality as well as quantity that are involved. There is the danger that environmental problems will be inade-

law was with the claimants; (3) the company's laches defense was without merit; (4) claimants' injuries were "the direct and proximate result" of the shredder operation and thus they were entitled to compensatory relief; (5) the continuing nature of the nuisance entitled claimants to injunctive relief; (6) the company's conduct was "wilful and wanton" and entitled the claimants to punitive damages; and (7) claimants were entitled to their costs in this case.

19. There are really two distinct kinds of nuisance law: public nuisance and private nuisance. The former was at common law a

criminal offense and involved such matters as the obstruction of highways. Private nuisance, on the other hand, was more limited in scope and required proof of interference with the plaintiff's use and enjoyment of his land. Further obstacles to successful suit for private nuisance included the reasonable use doctrine, by which a defendant had a privilege to use his premises in a reasonable way, regardless of its annoying characteristics to neighbors. See *Restatement (Second) of Torts* § 821(b) (Tent. Draft No. 17, 1971).

20. Prosser, "Nuisance Without Fault," 20 Tex. L.Rev. 399, 410 (1942).

quately treated by the piecemeal methods of litigation. It is possible that courtroom battles may be used to slow down effective policymaking for the environment. Litigation often fails to provide sufficient opportunities for the expert analysis and broad perspective that such policymaking often requires.

As difficult as environmental balancing may be, however, some forum for aggrieved parties must be made available. If necessary, the courts are qualified to perform the task.[21] The courts are skilled at "balancing the equities," a technique that traditionally has been one of the judicial functions. Courts are insulated from the lobbying that gives strong advantages to industrial polluters when they face administrative or legislative review of their operations. The local state or federal court, because of its proximity to the individual problem, is often in a better position to judge the effect of a pollution nuisance upon a locality.[22] For all of these reasons, the balancing in this case, although difficult, was nonetheless a proper function for the court below to perform. All other forums for obtaining relief were cut-off from the claimants and they understandably turned to the courts for relief.

The problem of balancing the equities in this case, however, was compounded by the fact that the company was not the ordinary industrial polluter. Usually, industrial polluters bring only their proprietary rights to be balanced on the scale opposite the community interests in a cleaner environment. The polluter asks the court to give due weight to the contributions that the business enterprise makes to the community by its economic achievements: payroll, taxes, investment of profits. Although when contrasted with the direct damage caused by uncontrolled pollution, such contributions may seem indirect, they are nonetheless entitled to serious consideration. No court could lightly decide to shut down a business that was the sole or principal livelihood of a community's citizens. Economic and property interests are entitled to significant weight. But here, the Indiana Auto Shredders Company makes more than only those economic contributions to the Indianapolis community; it is making a direct contribution toward improving the environment and conserving its natural resources by the recycling of abandoned automobiles. In curtailing the company's operations, the court below chose a very serious course of action.[23] It is our view that such a course of action must be based upon conspicuous facts and reasonable standards of law.

In the preceding sections, the facts of this dispute have been elaborately detailed. Our remaining discussion must focus upon the specific legal standards appurtenant to pollution nuisance cases and a critical analysis of the trial court's application of those standards to the facts of this case. At the outset, one notes that environmental litigation of this type, whether based upon the Indiana nuisance statute or the common law of nuisance, logically will involve two stages of adjudication. First, the court or trier of fact will determine whether the facts alleged actually constitute a nuisance and a nuisance of what type.[24] Second, having determined the nature of the alleged nuisance, the court will fashion relief appropriate to the equities of the case. Each of these two stages implicate their own legal standards.

Some activities, occupations, or structures are so offensive at all times and

**21.** Judge James L. Oakes of the United States Court of Appeals, Second Circuit, has argued strongly for a judicial role in environmental regulation. See Oakes, "Environmental Litigation: Current Developments and Suggestions for the Future," 5 Conn.L.Rev. 531–556 (1973).

**22.** Id. at 551.

**23.** See text at notes 16–17, *supra*.

**24.** The statute defines nuisance in general language, and the court must determine whether facts charged bring a particular case within the statute. *Lake Shore & M. S. Ry. Co. v. Chicago, L.S. & S.B. Ry. Co.*, 48 Ind.App. 584, 92 N.E. 989, *reh. denied* 48 Ind.App. 584, 95 N.E. 596 (1910).

under all circumstances, regardless of location or surroundings, that they constitute "nuisance per se." Activities that imminently and dangerously threaten the public health fall into this category. It is more often the case, however, that the activities challenged by suitors in a nuisance case fall short of this standard of imminent and dangerous harm. Such activities as cause more remote harm to people or are the source of inconvenience, annoyance, and minor damage to property are labeled "nuisance in fact" or "nuisance per accidens." These latter activities are nuisances primarily because of the circumstances or the location and surrounding of the activities, rather than the nature of the activities themselves. Most air and water pollution, when their effects are only minimally or remotely harmful to the public health, will be nuisances of this second type. Obviously, it is this second type that more frequently occurs. Very often this second type will present the offensive activities of an otherwise lawful business, activities that are being conducted in such a manner so as to become a nuisance.[25]

When there is an imminent and dangerous threat of harm from particular business activities, the determination of nuisance per se can easily be made. The second class of nuisance, on the other hand, depends for its definition on the facts and circumstances of each case.[26] Not every instance of inconvenience or interference will constitute a nuisance.[27] Nevertheless property owners have a right to require that an adjoining business be properly managed and conducted so as to avoid any unnecessary inconven-

ience or annoyance to them. Although it is only unnecessary and substantial annoyance that the law reaches out to prevent, whenever annoyances of this type exist, the sufferers are entitled to have their suffering alleviated. Depending upon the extent and circumstances of the annoyance, air, water, and noise[28] pollution may each constitute nuisance. As in the case of ordinary nuisance, lay evidence should be admissible to prove the existence of a pollution nuisance. Even when the pollution does not present imminent health hazards, those suffering the pollution ought to be allowed to show how the quality of their lives is diminished, despite any scientific expert's statement that the pollution is harmless.

Thus, in this first stage in the adjudication of environmental nuisance suits, it is for the court trier of fact to determine whether the facts of the particular case of pollution bring the activities of the polluter within the reaches of nuisance law.

If a pollution nuisance has been found to exist, the court must then decide what relief to grant to those suffering the nuisance. In this second stage in the adjudication of environmental nuisance suits, balancing the equities becomes all important. The court must decide whether injunctive relief, damages, or some combination of the two best satisfies the particular demands of the case before it. This is the difficult but necessary work the court must perform.

Of course, where the pollution from a mill or factory creates hazards

**25.** See, e. g., *Muehlman v. Keilman,* 257 Ind. 100, 272 N.E.2d 591 (1971) (noisy factory).

**26.** The Indiana courts have determined various activities to be a nuisance because of the facts of a particular case; i. e., an outdoor privy near a dining room, *Radican v. Buckley,* 138 Ind. 582, 38 N.E. 53 (1894); saloon, *Haggart v. Stehlin,* 137 Ind. 43, 35 N.E. 997 (1893); broken down steam engine, *Deller v. Hofferberth,* 127 Ind. 414, 26 N.E. 889 (1891).

**27.** On the particular facts of a given case, the Indiana courts have failed to find an activity to be a nuisance; i. e., a cemetery, *City of Green-*

*castle v. Hazelett,* 23 Ind. 186 (1864); a railroad line, *New Albany & S.R. Co. v. Higman,* 18 Ind. 77 (1862); a horse stable in an industrial district, *Thompson v. Elzy,* 83 Ind.App. 215, 148 N.E. 154 (1925).

**28.** It is clear that noise pollution may constitute sufficient annoyance to adjoining property owners to be classified as a nuisance. A recent Indiana case, *Muehlman v. Keilman,* 257 Ind. 100, 272 N.E.2d 591 (1971) held factory noise to constitute a nuisance to residential property owners.

that imminently and dangerously affect the public health, the appropriate relief is a permanent injunction against the continuation of the polluting activities. It would be unreasonable to allow a private interest in the profits and product of such a polluting menace to outweigh the community's interests in the health of its citizens. However, a permanent injunction that shuts down a mill or factory without consideration of the extent of the harm that its pollution caused would be equally unreasonable. Pollution nuisance cases present no special features that should exempt them from the equitable requirements for injunctive relief, including proof of irreparable harm and inadequate remedy at law. As the Indiana Supreme Court has stated:

> A court of equity will not interfere to restrain a legitimate business, except where the injury is material and the reasons for granting the injunction are strong. *Griffin v. Hubbell*, 212 Ind. 684, 11 N.E.2d 136 (1937).

Reasonableness is the standard by which the court should fashion its relief in ordinary nuisance cases, *Meeks v. Wood*, 66 Ind.App. 594, 118 N.E. 591 (1918), and reasonableness is also the appropriate standard for relief from environmental nuisance. Ordinarily a permanent injunction will not lie unless (1) either the polluter seriously and imminently threatens the public health or (2) he causes non-health injuries that are substantial and the business cannot be operated to avoid the injuries apprehended. Thus the particular situation facts of each pollution nuisance case will determine whether a permanent injunction should be issued. When a business' offensive activities fall short of that standard, only the combination of both reckless disregard of substantial annoyances caused to adjoining property owners plus the impossibility of mitigating the offensive characteristics of the business will justify the granting of permanent injunctive relief.

 Turning then to the instant case, the decision to permanently close the Indiana Auto Shredders Company

was made in error. Although the record indicates that industrial wastes are generated beyond the confines of the property, such facts are not supportive of permanent injunctive action unless injury to health, safety, or welfare is shown. All of the testimony as to appellant's violation of the regulations of the Division of Public Health and Hospital Corporation of Marion County, Indiana, and the Indiana State Board of Health has been negative. The testimony of the authorities and scientific experts was that no violation of state or local health and safety regulations has occurred. Even the claimants' own scientific tests show compliance. Thus the findings of the district court as to violations of the zoning ordinance regarding the emission of particulate matter, earth vibrations, sound, and odorous matter in such quantities as to endanger the public health and safety are clearly erroneous. Under these circumstances and in the absence of any proof of the substantiality of the damage or the incorrigibility of the shredder's operation, the permanent injunction must be ordered withdrawn. We turn then to the specific findings made by the district court.

## IV. THE FINDINGS OF THE DISTRICT COURT

The court first found several violations of the Restrictive Covenants, previously enumerated: (1) the shredding operation was not "itself self-contained"; (2) the development standards appropriate to classification I–5–U have not been met; (3) the property of appellant has not been properly landscaped; the buffer strip surrounding the operation has not been installed; (4) and industrial waste is generated beyond appellant's property.

We find ample support for the findings as to the landscaping of the property and the buffer strip, and on remand the court should give appellant a reasonable time to fully perform this obligation. But as to the standards required under classification I–5–U, there was substantial evidence that the appropriate

authority, the Department of Development, found appellant to be in full compliance in issuing the license and under the facts here, we cannot go behind such a finding. The court's finding that the appellant's operation is not "in itself self-contained" is of no moment here. We find no specific allegation or proof in the record on this. There is, of course, considerable proof that industrial waste is generated beyond the confines of the property, but this fact is not supportive of injunctive action since no injury to health, safety or welfare was shown.

Next, the court makes findings as to compliance with Ordinances Regulations, etc. Since the screening and landscaping requirements of the zoning ordinance are practically identical to the requirements of the Restrictive Covenants in this regard, the court's finding on the same is appropriate, and the appellant should be compelled to comply. But the findings as to violations of the city zoning ordinance as to the emission of particulate and of earth vibrations, sound and odorous matter in such quantities as to endanger the public health, safety and welfare appear to us to be clearly erroneous. The scientific tests all show compliance with the relevant ordinances. We assume that the finding as to a violation of fire and explosive requirements has to do with some isolated instances of explosions at the shredder during the trial on the merits. The cause of the explosion was found to be gasoline that was inadvertently left in the tanks of cars before being shredded. The record indicates that these mishaps have been remedied and no explosions occurred subsequently. All of the testimony as to appellant's violation of the regulations of the Division of Public Health and Hospital Corporation of Marion County, Indiana, and the Indiana State Board of Health has been negative. This finding is, therefore, clearly erroneous. Likewise the testimony of relevant public officials that appellant was not in violation of either state or local health and safety regulations, renders this finding clearly erroneous.

As the trial judge found in his colloquy at the end of the taking of testimony on the merits, "the record indicates a great deal of change has been worked since the date of . . . the hearing on the petition for preliminary injunction." The company showed that two additional stacks some 40 feet in height and three to four feet in diameter had been installed to draw off the dirt, dust, particulate, etc.; that covers had been installed over the conveyor belts; that water was induced into the shredder itself to wet down all of the non-ferrous material and reduce dust and dirt to the minimum and also prevent particles from flying into the atmosphere; that the walls of the collecting bins were raised 12 feet making the total height 22 feet; that a heavy rubber cover was inserted underneath the cutter bar in the shredder plant to eliminate noise when the bar hit the cutting plate; and that a modern street sweeper-water sprayer is used in the automobile stack area to remove the dust and mud that comes in with the discarded automobiles. And, finally, appellant dug a ditch 22 feet deep and 600 feet long during the Christmas recess of the trial to alleviate the earth vibrations.

The testimony of one witness was that the ditch reduced the vibration level 50 percent, that the pollution is "a lot less than what it was," and that the changes brought "great improvement" in the "smoke and stuff" coming from the shredder. The court based its final judgment on evidence produced at the October preliminary hearing on the injunction rather than giving consideration to these corrective improvements and conducting tests as to their effectiveness.

The evidence showed that the residence in the Irish Hill section were for the most part about one hundred years old—none being less than 50 years, and that present law prevents residential construction in the future. It showed that the area was near an interstate highway, a main line railroad and a community dumping ground. Previously a railroad roundhouse was occupying the

spot where the shredder was located. The area had been zoned for industrial use for over half a century, and the re-zoning of the company site for shredder use was three years before appellant began construction. The I–5–U zoning category specifically permits use of the property for metal operations.

Most significant was the fact that not a single expert or governmental official charged with enforcement duties testified to a single significant violation by appellant of any relevant zoning standard. Indeed, all of the testimony showed that the shredding operation was well within standards and that appellant obtained all governmental certificates and permits required of it. The appellant's use of the property was never challenged by any city, state or federal authority and every expert who testified concluded that the appellant's operations were in compliance with all relevant codes, ordinances, etc.

We can well appreciate and fully sympathize with the unhappiness of the appellees over their situation. However, the problem of zoning is a local one, governed by local law; it must be solved in local perspective. The appropriate local authority has zoned the property specifically for shredder use; and appellant has been issued a permit to so use the property. After careful and continued tests by reputable experts as well as public officials, appellant's operation has met all the required standards. Under these circumstances and in the absence of an imminent hazard to health or welfare—none of which was established or found present here, the appellant cannot be prevented from continuing to engage in the operation of its shredding. See *Reserve Mining Co. v. United States*, 514 F.2d 492 (8th Cir. 1975). The national environmental policy, as announced by Congress, allows offending industries a reasonable period of time to make adjustments to conform to standards. See, e. g., Clean Air Act, 42 U.S.C. §§ 1857c–5 to 8 (1970); National Environmental Policy Act, 42 U.S.C. § 4331 (1970). Appellant is a new undertaking in Irish Hill; it too is entitled to a reasonable period of time to correct any defects not of imminent or substantial harm. If there is damage to property, of course, it is recoverable here as in any other case.

The trial court based its action on the existence of a common nuisance but even if such were present, the drastic remedy of closing down the operation without endeavoring to launder its objectionable features would be impermissible under our law. Accord *Chicago v. Commonwealth Edison Company*, 24 Ill.App.3d 624, 321 N.E.2d 412 (1974). In applying the test of the cases, we find no ground *on which to base a permanent injunction* here.

This is not to say that those features of the appellant's operation that are found to be offensive should not be remedied. We only say that the offender shall have time to correct the evil. If the appellant does not correct the infractions presently existing within a reasonable period, the district court may take action that will require the appellant so to do. Likewise, on remand, if the district court deems it advisable to have the appraisal of a neutral expert as to the air contamination, he may proceed to obtain one.

## V. DAMAGES

It follows that the damage awards must fall. In this connection we believe effective administration requires that we express our opinion that the permanent damage award made here was not permissible in the light of the granting of injunctive relief. The measure of damages in Indiana in private non-permanent nuisances is loss of use and it is measured in rental value. *Davoust v. Mitchell*, 146 Ind.App. 536, 257 N.E.2d 332 (1970); *Cox v. Schlachter*, 147 Ind. App. 530, 262 N.E.2d 550 (1970).

Nor do we believe that punitive damages, as of this date, are recoverable. *Newman v. Nelson*, 350 F.2d 602 (10th Cir. 1965). Our reading of the record indicates that the appellant cooperated

with all government agencies. It did its best to improve the operation of its shredder so as to alleviate damage, discomfort, and inconvenience. Indeed, the district court permitted it to continue in business for 40 days after its death sentence was pronounced. On balance, we do not find grounds for punitive damages.

The judgment is reversed, the permanent injunction is dissolved, and the case is remanded for further proceedings in accordance herewith. We direct that on remand the case not be reassigned under Circuit Rule 23.

It is so ordered.

FAIRCHILD, Chief Judge (dissenting in part).

With great respect, I reach a different conclusion, in part:

(1) *Liability for Nuisance.* Indiana provides a cause of action for nuisance for "Whatever is . . . offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of life or property." Burns Indiana Statutes Annotated §§ 2–505 through 2–507.

With respect to defendant's air pollution, the district court found it sufficient to interfere with the comfortable enjoyment of life and property in the neighborhood. With respect to ground vibrations and noise caused by the defendant's operations, the court found they were such as to cause physical discomfort to persons of ordinary sensibilities having regard for the conditions in the surrounding neighborhood. Impliedly, at least, in the findings as to property damage, the court found that the ground vibrations caused physical structural injury to many of plaintiffs' properties.

I am unable to conclude that these findings are clearly erroneous, and they seem a sound predicate for the decision that defendant is liable for nuisance. *Davoust v. Mitchell*, 146 Ind.App. 536, 257 N.E.2d 332 (1970). This is true even though defendant's business conforms to the zoning ordinance. *Cox v. Schlachter*, 147 Ind.App. 530, 262 N.E.2d 550 (1970).

(2) *Punitive Damages.* The district court wrote: "The defendant's conscious disregard for the rights of the plaintiffs and intervenors to the free use of their property, and so as to essentially interfere with the comfortable enjoyment of their life and property, is such that the court in its judicial discretion feels compelled to find that punitive damages should be assessed against the defendant and awarded the plaintiffs and intervenors." I agree with the majority that under the circumstances, including defendant's efforts to make its operations less destructive and annoying, and defendant's compliance with zoning requirements, the award of punitive damages was an abuse of discretion.

(3) *Compensatory Damages for Injury to Property.* The findings of the district court were extensive and carefully prepared. The damages listed as "Actual Damages," were in many instances a combination of separate allowances for personal annoyance and the like and for injury to property.

With respect to the latter, as I understand the findings, the court found that physical injury to the plaintiffs' structures had been caused by the vibrations transmitted from defendant's operations, and, after considering the testimony as to value before the operations began and value at the time of trial, and testimony as to the cost of repair, fixed a damage figure. In many instances, the allowance was substantially less than the cost of repair. The allowance exceeded the estimated cost of repair in only a few instances. I do not understand that these allowances assumed the future continued operation of the shredder as an element depressing the market value of the property and enhancing the allowance. It appears that the court followed a sound method of determining damages for physical injury to property, which would not be alleviated by the abatement of the nuisance. Although the findings of causation are not generally supported by expert testimony, I conclude they represent reasonable inferences from the circumstances and the se-

quence of events disclosed by the testimony, and I am not able to deem them clearly erroneous. Certain allowances for repair to machinery should likewise be sustained.

In the case of plaintiff Harrison, there may well have been duplication and hence error, since he was allowed both repairs to his building and loss of value of his premises.

It seems also if the dissolution of the injunction now means that the nuisance will continue, plaintiffs will be entitled to at least the damages for injury to property already allowed, and probably more.

(4) *Compensatory Damages for Personal Annoyance and the Like.* In a number of instances, the district court awarded damages for inconvenience, discomfort, and loss of enjoyment, by allowing $20.00 per day from the commencement of defendant's operation to the close of the trial. This type of formula might well achieve a reasonable and defensible result, but appears to be inconsistent with a principle of damages followed in Indiana. *Davoust, supra.* Apparently because the nuisance is deemed, while it continues, to reduce the value of a plaintiff's use of his property, damages for a nuisance which is abated are measured by the diminution of the rental value of the property during the time the nuisance existed. As to this element of damages, I agree that there is no evidence of diminution in rental value to sustain the $20.00 per day figure for those to whom it was allowed.

(5) *Injunction.* In this connection the district court said:

"Short of dispossessing the plaintiffs and intervenors of their properties by the defendant's buying them out, the hurt worked upon them is of such a continuous and frequent recurrence that no reasonable redress can be had at law. So far as this Court knows, American Jurisprudence has not reached the point where the plaintiffs and intervenors can be forced to sell and vacate their properties against their will. For these reasons the Court finds that the plaintiffs and intervenors should be granted the injunctive relief they seek. And in this respect the Court has carefully weighed the comparative injury the plaintiffs and intervenors will suffer on the one hand, and the defendant on the other, in granting or withholding injunctive relief. Here the defendant is not engaged in the development of any natural resources such as the mining of coal or the quarrying of stone. It is engaged in a business that may be carried on elsewhere less injuriously to the rights of others."

I find it difficult to fault the district court's consideration of the matter or its conclusion. I would, however, because of the policy considerations noted by the majority, conclude that the injunction should be modified so as to permit further operation of defendant's facility, subject to appropriate conditions and judicial supervision, to the end that it might be determined at what level, if any, the facility could be operated without unreasonable interference with the comfortable enjoyment of claimants' property, or could reasonably be operated upon payment of compensation to claimants for the continuing burden.